**In re SCOTT WETZEL SERVICES, INC., Debtor.**

**Larry S. Hyman, Chapter 7 Trustee for Scott Wetzel Services, Inc., Plaintiff,**

**v.**

**Legion Insurance Company, Defendant.**

**Bankruptcy No. 98–18366–8P7.
Adversary No. 00–616.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

April 17, 2002.

Jeffrey W. Warren, Tampa, FL, for plaintiff.

John D. Goldsmith, Tampa, FL, for defendant.

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Bankruptcy Judge.

On October 21, 1998, Scott Wetzel Services, Inc. (Debtor) filed its Petition for Relief under Chapter 11 of the Bankruptcy Code. Its attempt to reorganize came to an abrupt halt on December 28, 1998 when the Chapter 11 case was converted to a Chapter 7 liquidation case. In due course, Larry S. Hyman was appointed and placed in charge of the administration of the Chapter 7 estate of the Debtor as trustee (Trustee).

The present matter before this Court is Adversary Proceeding No. 00–616, commenced by the Trustee who filed a Complaint consisting of four counts. The claim in Count I is based on the allegation by the Trustee that within the 90 days preceding of the commencement of the Chapter 11 case, on September 23, 1998, the Debtor, while insolvent, transferred the sum of $525,000 to Legion Insurance Company (Legion Insurance) on account of an antecedent debt it owed to Legion Insurance. It is further contended by the Trustee that as a result of the transfer, Legion Insurance, if permitted to retain the funds, would recover more on its claim that the other unsecured creditors will receive in this Chapter 7 liquidation case. According to the Trustee, the transfer was a preferential transfer voidable by the Trustee pursuant to 11 U.S.C. § 547(b)(4)(A).

The claim in Count II of the Complaint is also an alleged voidable preference based on Section 547(b)(4)(B) of the Code.

In support of the claim in Count II, the Trustee alleges that at the time relevant, Legion Insurance was an "insider" of the Debtor, thus transfers outside of the 90 days and during the 1 year preceding the commencement of the case are also recoverable as preferential transfers.

In Count III of the Complaint, the Trustee seeks to avoid and recover actual fraudulent transfers pursuant to Section 548(a)(1)(A) of the Code. The Trustee seeks to recover all transfers, including the $525,000 transfer and the six transfers that totaled an aggregate amount of $4,225,000, during the relevant time.

In Count IV of the Complaint, the Trustee seeks to avoid and recover constructive fraudulent transfers pursuant to Section 548(a)(1)(B) of the Code. The Trustee seeks to recover all transfers, including the $525,000 transfer and the six transfers that totaled an aggregate amount of $4,225,000, during the relevant time.

The immediate matter under consideration are two Motions for Summary Judgment, one filed by the Trustee and the other by Legion Insurance. The Trustee's Motion for Summary Judgment is directed to Count I of the Complaint only, whereas Legion Insurance's Motion for Summary Judgment is directed to all Counts of the Complaint. This opinion only deals with the viability *vel non* of the claim of Count I. It is the contention of both parties that there are no genuine issues of material facts and each is entitled to a judgment in their respective favor as a matter of law.

The facts relevant to the claim set forth in Count I, as appear from the record, are indeed without substantial dispute and can be summarized as follows. At the time relevant, the Debtor had been engaged in the business of administering claims on behalf of several insurance com-

panies, including Legion Insurance. Legion Insurance is in the business of providing workmen's compensation insurance, among other types of insurance. Legion Insurance entered into several contracts with the Debtor under which the Debtor was to serve as a third party administrator of claims filed by the insureds of Legion Insurance. A contract entered into on November 13, 1991, among the Debtor, Legion Insurance, and Visiting Nurse's Association of Texas, Inc. is typical and similar to other agreements between the Debtor and Legion Insurance. Although it is claimed that there were instances were some entities' clients of the Debtor were self-insured and not insured by Legion Insurance, there is nothing in the record to establish in fact that this assumption is correct. Be as it may, it appears that in states where the entity elected to be self-insured, the entity was required to procure back-up insurance to assure that all proper workmen's compensation claims were paid and Legion Insurance may have been involved in such instances.

The duties of the Debtor under a typical contract is set forth in detail in Section III(3.1). Without setting forth the specifics, it shall suffice to state that it was the Debtor's obligation to deal with all claims made by the insureds of Legion Insurance; to maintain the records of all claims made by the insureds; to determine the proper benefits to be paid; to make timely payments of the benefits due to an insured; and to assist counsel in instances were the claims were disputed.

The duties of Legion Insurance is set forth in Section V(5.1) of the contract. It was the sole responsibility of Legion Insurance to provide all funds to the Debtor for the payment of the claims and the allocated loss expenses. Legion Insurance agreed to maintain a claim fund account for the purpose of making payments to the Debtor for claims and expenses incurred on behalf of Legion Insurance. Under Section VII(7.1), the Debtor had the authority and control in all matters pertaining to the handling of claims under the agreement except of the aggregate expenditures in excess of $10,000,000.

In order to implement the program, Legion Insurance maintained bank accounts in Milwaukee, Wisconsin (Milwaukee Accounts) and deposited the funds which were necessary to pay the claims made by Legion Insurance's insured and the expenses. The fees of the Debtor were paid by the insureds. It is without dispute that the only entity who had authorization to make withdraws and/or transfers was the Debtor.

Under their arrangement, the Debtor established and maintained the "Scott Wetzel Services, Inc., ITF Legion Insurance Master Account" (account no. 1408822418) at Bank of America, formerly Barnett Bank (Bank of America), which was also referred to by the parties as an "escrow account" (Legion Master Account). The Legion Master Account was used to deposit all funds received from the Milwaukee Accounts. Then, the Debtor would transfer the funds to individual trust accounts opened and maintained by the Debtor for each insured of Legion Insurance serviced by the Debtor. The Debtor opened and maintained approximately 80 separate trust accounts, also referred to as zero accounts (Zero Accounts). The Zero Accounts were cleared every day when the particular claim was paid.

Under their arrangement as described by a typical contract, the Debtor had the right to debit weekly, through the automated clearinghouse (ACH), funds which was basically a wire transfer from the Milwaukee Accounts to the Legion Master Account set up by the Debtor. The Le-

gion Master Account was solely controlled by the Debtor and all authorized signatories were the employees of the Debtor. Legion Insurance was not designated as a signatory. The claims of the insureds of Legion Insurance were paid by check drawn on the Zero Accounts from monies transferred from the Legion Master Account in the amount necessary to pay the claim. The transfer of the funds from Milwaukee was determined by the history of the payment of the claims of the insured.

In early February 1998, Legion Insurance informed the Debtor that the ACH withdrawals on the Milwaukee Accounts were in excess of the claims paid by the Debtor. In essence, there was an overage of monies from the Milwaukee Accounts to the Legion Master Account. Legion Insurance and the Debtor agreed that the Debtor would maintain a lower escrow balance and pay back the overage to Legion Insurance. On February 3, 1998, the Debtor transferred $3,904,913.37 from the Legion Master Account to Legion Insurance. And, on February 24, 1998, the Debtor transferred an additional $1,104,622 from the Legion Master Account to Legion Insurance. It is without dispute that these amounts reduced the "obligation" due to Legion Insurance as a result of the overage. The Debtor and Legion Insurance continued to do business after February 1998.

By September of 1998, it was apparent that the Debtor was in financial trouble as the Legion Master Account was constantly overdrawn. It is without dispute that by September 8, 1998, the Master Account was in a serious overdrawn position, indicating an overdraft of $802,084.33. This was due to the fact that Bank of America honored checks drawn by the Debtor on the Legion Master Account when there were not sufficient funds in the account to cover the checks drawn and there were several claims which had to be paid to the insureds by the Debtor on behalf of Legion Insurance. Because of the status of the Legion Master Account, Legion Insurance cancelled the Debtor's authority to obtain any more funds through ACH from the Milwaukee Accounts.

Because there were unsatisfied outstanding claims that had to be satisfied by the Debtor, it is without dispute that on September 24, 1998, the Debtor withdrew from its operating account the sum of $525,000 and deposited the same in the Legion Master Account. The funds transferred were originally funds of the Debtor maintained with Smith–Barney brokerage house. With these funds, the Debtor paid the claims of the insureds of Legion Insurance including National Hospice (NHOIA), Media Services, Belmont Constructor, Herman Hospital, Patterson Smith Hospitality, and other insureds totaling in excess of the $525,000 deposited by the Debtor in the Legion Master Account. *See* Affidavit of Lillian Conrad, and Exhibits A, B, C, D, E, F & G. Surprisingly, however, Bank of America credited the Legion Master Account to the then outstanding overdraft balance on September 10, 1998, of $802,084.33 thereby reducing the overdraft balance to $277,084.33. Basically these are the relevant undisputed facts based on which both parties contend that they are entitled to a judgment on Count I as a matter of law.

It is the contention of the Trustee that the transfer of $525,000 were funds of the Debtor used to pay claims pursuant to the agreement on behalf of Legion Insurance to whom the Debtor was indebted in the amount of $6,023,926, according to the proof of claim filed by Legion Insurance on April 22, 1999. According to the Trustee, at the time the Debtor deposited the $525,000 into the Legion Master Account:

(1) the Debtor was insolvent; (2) it was a payment on account of an antecedent debt inasmuch as the Debtor was indebted to Legion Insurance; (3) it is not in serious dispute that if Legion Insurance is permitted to retain the benefits of the payment made by the Debtor on behalf of Legion Insurance, Legion Insurance's liability to the insureds would have been reduced by $525,000; and (4) the payment was made within the 90 days preceding the filing of the Debtor's bankruptcy case. Thus, it is the Trustee's contention that the payment can be recovered as a voidable preference pursuant to Section 547(b)(4)(A) of the Code.

Based on the same facts, Legion Insurance contends that the transferred funds by the Debtor of $525,000 to the Legion Master Account was a payment to Bank of America in order to reduce the overdraft caused by the Debtor which was the debt owed by the Debtor to Bank of America, and was not a payment made on behalf of Legion Insurance. Thus, if anybody received a voidable preference, it was Bank of America and not Legion Insurance. In support of this proposition, Legion Insurance points out that Florida Statutes § 674.104(1)(e) provides that the holder of an account, if the account is overdrawn, is indebted to the bank. However, Section 674.104(1)(e) is the section that defines "customer" as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."

The common feature of both of the conflicting contentions of the Trustee and Legion Insurance are that the controlling facts are without dispute. It must be pointed out at the outset that in an action to recover preferential transfer pursuant to Section 547(b)(4)(A), the burden of proof is on the Trustee, who must establish by the preponderance of the evidence that he is entitled to a judgment as a matter of law. Applying this standard, it is evident that if the evidence is in equilibrium that is, equally supports the position of the plaintiff and the defendant, the plaintiff has failed to establish with the requisite degree of proof, thus the plaintiff is not entitled to the relief sought.

In the present instance, there is evidence that the $525,000 transferred by the Debtor from its operating account of its own funds to the Legion Master Account was used to pay claims of Legion Insurance's insured, thus the payment was for the benefit of Legion Insurance. As noted earlier, in September of 1998 when Legion Insurance froze the Milwaukee Accounts, there were outstanding claims of insureds by Legion Insurance that Legion Insurance had the contractual obligation to pay. It is without dispute that the Debtor in fact paid these claims and thus relieved Legion Insurance of the liability of those claims. While it is true that this transaction does not fit into the orthodox view of a garden variety voidable preference, in that the transfer of funds by the Debtor was not to Legion Insurance directly, whom the Debtor was indebted, but to Legion Insurance's insureds, which certainly conferred a quantifiable benefit to Legion Insurance, it nevertheless satisfies a liability which was not the Debtor's liability but that of Legion Insurance.

The attachments to Legion Insurance's proof of claim indicate that Legion Insurance derived the amount owed from the Debtor to Legion Insurance by calculating the amounts "wrongfully" transferred out of the Legion Master Account totaling $11,738,614.10 less amounts transferred to or for the benefit of Legion Insurance, including the $525,000 payment in dispute, leaving a total of $7,328,614.10 owed to Legion Insurance. It is evidence from the

foregoing that Legion Insurance conceded that the payments to its insureds in the amount of $525,000 conferred a quantifiable benefit to Legion Insurance. There is no dispute that the $525,000 was made to pay claims to the insureds of Legion Insurance.

The documents attached to the Affidavit of Ms. Conrad, indicate that more than $525,000 worth of claims were satisfied to insureds of Legion Insurance following the transfer of the $525,000 into the Legion Master Account from the Debtor.

The Affidavits filed by Legion Insurance do not directly dispute Ms. Conrad's Affidavit. On the contrary, all Affidavits recite the relationship between the Debtor and Legion Insurance, indicate that Legion Insurance was not the customer of Bank of America and merely state that the Legion Master Account was in an overdrawn state. *See* Affidavit of Gregg C. Frederick, Senior Vice–President, Contract Compliance of Legion Insurance, paragraph 6: Legion Insurance did not have signatory authority with respect to Trust Account ... Debtor had control and dominion over Trust Account. And paragraph 7: Legion Insurance was not a customer of the bank.

The Affidavit of Stanley A. Murphy, Director in the Financial & Claims Division of Peterson Consulting's Tampa office, is the closest affidavit to directly contravene the Affidavit of Ms. Conrad. Mr. Murphy is a Certified Public Accountant who was hired by Legion Insurance. In paragraph 8 of his Affidavit he states "the 525 transfer was never transferred to an external Legion account, only transferred from one SWS account to another." And in paragraph 11 he states:

Based on my analysis, in my opinion ...

G. The September 24, 1998 fund transfer by SWS to the Legion Master Account in the amount of $525,000 was not an avoidable, preferential transfer as the funds were under the control of SWS at all times in both the operating and Legion Master Account, and were never transferred externally to Legion ...

I. Maintaining negative bank balances was a common business practice of SWS.

It is evident that the statements in the Affidavit of Mr. Murphy are not fact statements based on personal knowledge but are legal conclusions, which as a matter of course, this Court should disregard and cannot consider. This Court rejects the argument advanced by Legion Insurance that the Legion Master Account was "just another" account of the Debtor. The Legion Master Account was specifically opened "in trust for" Legion Insurance and it is without dispute that the Debtor had a separate operating account.

With respect to the elements necessary to satisfy under 11 U.S.C. § 547, the parties agreed that the only issue was regarding the satisfaction of 11 U.S.C. § 547(b)(1) "to or for the benefit of a creditor," and all other elements had been satisfied by the Trustee. This Court is satisfied that the evidence supports the Trustee's contention that the $525,000 was transferred from the Debtor to or for the benefit of Legion Insurance. Therefore, the Trustee has met its burden on summary judgment and that the transfer of $525,000 is voidable as a preferential transfer pursuant to 11 U.S.C. § 547(b)(4)(A).

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Trustee's Motion for Partial Summary Judgment be, and the same is hereby, granted. A separate partial final judgment shall be entered in favor of the Trustee and against Legion

Insurance consistent with this Order. It is further

ORDERED, ADJUDGED AND DE-CREED that the Defendant's Legion Insurance Company's Motion for Summary Judgment be, and the same is hereby, denied as to Count I only. It is further

ORDERED, ADJUDGED AND DE-CREED that a separate Partial Final Judgment shall be entered in accordance to this opinion.